UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Peter Lopez,

                                   Plaintiff,

                                                           Hon. Hugh B. Scott

                                                           **07CV0365**
                                                           **Consent**

                          -v-
                                                           **DECISION**
                                                           **& ORDER**

BRIAN FISCHER, et. al

                                   Defendants.
_____

          Before the Court is the defendants' motion for summary judgment (Docket No. 100).[1]


                              **Background**

          The plaintiff, Peter Lopez ("Lopez"), brings this action pursuant to 42 U.S.C. § 1983.

The plaintiff alleges that the defendants[2] failed to reasonably accommodate him as a visually

_____

          [1]  The parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28
U.S.C. § 636(c).  (Docket No. 37).

          [2]  The defendants are: Brian Fischer"("Fischer"), Commissioner of the New York State
Department of Correctional Services; Robert Raymond ("Raymond"), A.D.A. Coordinator;
James Kennedy ("Kennedy"), Commanding Hearing Officer; Robert Kirkpatrick ("Kirkpatrick"),
Superintendent of Wende Correctional Facility ("Wende");  William R. Smith ("Smith"), Deputy
Superintendent of Program at Wende; Girard Monahan ("Monahan"), Deputy Superintendent of
Security at Wende; Martin Kearney ("Kearney"), a Captain at Wende; Susan Post ("Post"),
Deputy Superintendent of Health Services at Wende; Timothy Tracz ("Tracz"), Acting Deputy
Superintendent of Programs at Wende; Jaqueline Levitt, M.D. ("Levitt"), a physician at Wende;

impaired inmate and discriminated against him while he was confined in the Special Housing

Unit ("SHU") at the Wende and Sullivan correctional facilities in violation of Title II of the

Americans with Disabilities Act ("ADA") (29 U.S.C. § 12101 et seq.), section 504 of the

Rehabilitation Act of 1973 ("§ 504") (29 U.S.C. § 799 et seq.), the New York State Human

Rights Law ("NYSHRL") (N.Y. Exec. Law § 296, et. seq.), and the Eighth and Fourteenth

Amendments to the United States Constitution.

It is not disputed that Lopez has a visual impairment known as Best's Disease which

constitutes a handicap under the ADA and §504. (Docket No. 101 at ¶ 4; Docket No. 102 at page

6).  The plaintiff asserts that Best's Disease acts "as though there is an object in the center of

[his] eye that blocks [his] direct line of vision.  Lopez states that he can see only by using his

peripheral vision. (Docket No. 132 at ¶ 3).  According to the plaintiff, using his peripheral vision

to focus on a detailed object causes him pain after more than a few minutes. (Docket No. 132 at ¶

4).

On or about January 22, 2007, the plaintiff was found guilty of assaulting another inmate

at Wende and, as a result, he was confined to SHU between approximately January 22, 2007 and

July 22, 2007. (Docket No. 101 at ¶ 7).  On or about May 30, 2008, Lopez was found guilty of

assaulting a facility staff member at Sullivan. (Docket No. 101 at ¶ 32). Based upon that event,

and other disciplinary charges, Lopez was confined to SHU at Sullivan from February 20, 2008

to May 14, 2008, and again from May 30, 2008 to August 2009. (Docket Nos. 101 at ¶ 32;

---

Ann M. Andzel ("Andzel"), Correction Counselor at Wende; James J. Walsh ("Walsh"),
Superintendent of Sullivan Correctional Facility ("Sullivan");  Patrick Griffin ("Griffin"), Deputy
Superintendent of Security at Sullivan;  and Patty Nelson ("Nelson"), Deputy of Programs at
Sullivan.   (Docket No. 101 at ¶ 2; Docket No. 129 at ¶ 2).

Docket No. 133 at page 3).[3]  Lopez asserts that while he was in SHU he was denied various accommodations relating to his visual impairment, including a reading scanner, a typewriter, a talking dictionary, an inmate mobility assistant ("IMA"), access to the Resource Room (which has various assistive devices), a desk and chair, a talking chess set[4], and that he was not allowed to keep as many books as sighted inmates. (Docket No. 55 at ¶¶ 43, 48, 49; Docket Nos. 132 at ¶¶ 8-22; Docket No. 133 at page 3).  When Lopez was released from SHU and returned to general population, he was given access to these accommodations again. (Docket No. 133 at page 3).

The defendants argue that Lopez received reasonable accommodations while he was confined to SHU. The defendants assert that while Lopez was in the Wende SHU, he was issued 20/20 pens, large print paper and envelopes, and an electric magnifier. (Docket No. 113, Raymond Declaration at ¶¶ 28, 42).  The defendants state that while Lopez was in the SHU at Sullivan he was issued a magnifier, a tape player and headphones, large print materials, a lamp, sunglasses for indoor use, an officer trained as a sited guide, and a talking dictionary. (Docket No. 113, Raymond Declaration ¶ 42).

Although the defendants denied the plaintiff a typewriter while in Shu, they assert that they provided him with adequate accommodations to enable him to write letters and court documents. The plaintiff was provided "20/20" pens, which are fine print magic markers that are easier for a visually impaired person to see because it writes darker and bolder than an ordinary pen. (Docket

---

[3]  Lopez asserts that the conviction upon which this disciplinary sentence was based was later reversed. (Docket No. 132 at ¶ 5).

[4]  The plaintiff has not demonstrated that sighted inmates are allowed to have chess sets in SHU.

No. 103, Andzel Declaration at ¶ 16). The 20/20 pens were distributed to the plaintiff weekly or as he requested them. (Docket No. 108, Kirkpatrick Declaration at ¶ 31). In addition, because the 20/20 pens are not capable of producing carbon copies, the plaintiff was also provided with four free copies of his written work, even though non-impaired SHU inmates are not provided with free copies. (Docket No. 108, Kirkpatrick Declaration at ¶ 30).

To assist with both reading and writing, the defendants also assert that Lopez was provided with a state-of-the-art electric magnifier containing various adjustable features to specifically suit the plaintiff's disability. (Docket No. 103, Andzel Declaration at ¶ 22). The plaintiff asserts that the magnifier was inadequate "because it did not enlarge the font enough." (Docket No. 132 at ¶ 19). The defendants argue that notwithstanding the plaintiff's claim, the evidence shows that the magnifier did indeed accommodate Plaintiff's needs. The defendants note that the plaintiff brought the magnifier to an outside doctor's visit even though he was not authorized to do so. (Docket No. 103, Andzel Declaration at ¶ 23). According to the defendants, at the time the plaintiff justified bringing the magnifier to the outside appointment by stating that he brought it in order to read the doctor's forms. (Docket No. 103, Andzel Declaration at ¶ 23). In his response to the instant motion, the plaintiff asserts that he brought the magnifier to the appointment to show the medical provider that the magnifier was inadequate. (Docket No. 132 at ¶ 20). The defendants also assert that the various grievances and letters written by Lopez while in SHU demonstrate that the magnifier was adequate in assisting him to read and write. (Docket No. 102 at page 9). Additionally, according to the defendants, upon request, the plaintiff was also able to obtain assistance from the Wende Instructor of the Blind ("IOB."), who helps visually impaired inmates in filing out forms and other writing needs (Docket No. 108, Kirkpatrick Declaration at ¶ 28), as well as access to the Law Library Officer, who makes rounds daily, for additional assistance with filling out forms and mail.

4

(Kirkpatrick Declaration at ¶ 26; Andzel Declaration at ¶ 24).  The defendants argue that these

accommodations were reasonable as to the plaintiff's writing needs and resolved Lopez' requests

for an electrical scanner and talking dictionary by alternatives which were more efficient, cost

effective, and which address legitimate security concerns.  (Docket No. 102 at page 9).

With respect to reading materials, the defendants also contend that the plaintiff had the

same access to books and law materials as sighted inmates while in SHU.  According to the

defendants, the Wende law library policy for inmates in SHU provides that each inmate is allowed a

total of five books, newspapers, or magazines every sixty days. (Docket No. 113, Raymond

Declaration at ¶ 34). The Wende general library also allows SHU inmates two books and one

magazine, which are also rotated every sixty days. (Docket No. 108, Kirkpatrick Declaration at ¶ 29).

The defendants assert that the plaintiff was afforded reading materials from both libraries consistent

with these policies.  (Docket No. 113, Raymond Declaration at ¶ 34; Docket No. 108, Kirkpatrick

Declaration at ¶ 29). In addition, the defendants state that upon his request the plaintiff had access to

large print legal materials as well as legal materials on tape, and books on tape, which he can listen

to on the cassette player he was issued. (Docket No. 113, Raymond Declaration at ¶¶ 29, 23). The

defendants argue that these accommodations, along with his use of the electric magnifier, allow the

plaintiff to enjoy and access legal materials and books as well as sighted inmates in the SHU.

(Docket No. 102 at pages 9-10).  Similarly, while at Sullivan, the defendants assert that the law

library allowed him a maximum of fifteen legal books and publications in his cell, while the general

library allowed him to have a total of ten books, magazines or newspapers in his cell. (Docket No.

113, Raymond Declaration ¶ 41).  The defendants state that notary public services are provided to

SHU inmates twice a week. (Docket No. 113, Raymond Declaration ¶ 41). In this regard, the

defendants assert that the plaintiff was  reasonably accommodated with respect to his reading and

writing needs and enjoys the same services and programs as non-disabled inmates in Sullivan SHU. (Docket No. 102 at page 12).

The plaintiff also claims that he was improperly denied a desk and chair while he was in SHU. (Docket No. 55 at ¶ 49).   The defendants assert that for security reasons SHU policy does not allow any SHU inmate to have a desk, chair, calculator or extension cord.[5]   (Docket No. 102 at page 10).

Finally, the plaintiff asserts that he was improperly denied the assistance of IMAs while he was in SHU. (Docket No.55 at ¶ 48).  IMAs are trained sited guides available to physically disabled or visually impaired inmates in the general population, to escort the disabled or impaired inmates around the facility. (Docket No. 113, Raymond Declaration at ¶ 13). According to the defendants, the plaintiff's request for an IMA while he was in SHU was denied due to security concerns.  The defendants assert that IMAs are not allowed in SHU due to the risk of harm. (Docket No. 113, Raymond Declaration at  ¶ 31). The defendants argue that the plaintiff had not sustained any injury or threat to his safety caused by a lack of IMA. (Docket No. 113, Raymond Declaration at ¶ 31). In addition, the defendants state that the SHU staff members have been trained by the Elizabeth Olmsted Center for Site and are able to appropriately provide Plaintiff with special assistance when moving around the facility when needed. (Docket No. 113, Raymond Declaration at ¶ 31; Docket No. 103, Andzel Declaration at  ¶ 16).

The defendants have moved for summary judgment asserting that the plaintiff was

---

[5]   The plaintiff asserts that he was denied adequate extension cords to use the limited accommodations provided to him while he was in SHU. (Docket No. 132 at ¶ 22).  The defendants assert that the SHU officers would plug the magnifier into a charger every night to ensure that the plaintiff was able to use it during the day. (Docket No. 103, Andzel Declaration at ¶ 22).  The defendants assert that no inmates in SHU are allowed to have extension cords. (Docket No. 102 at page 10).

provided with reasonable accommodations while he was placed in SHU at both Wende and Sullivan.

## DISCUSSION

**Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." Thomas v. Irvin, 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (internal citations omitted). A fact is "material" only if it has some effect on the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Catanzaro v. Weiden, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; see Bryant v. Maffucci, 923 F.2d 979 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." Bryant, 923 F.2d at 982. A party seeking to defeat a motion for summary judgment must do more than make broad factual

allegations and invoke the appropriate statute. The non-moving party must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial. Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).

Pursuant to Fed. R. Civ. P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001), citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); see also H.Sand & Co. v. Airtemp Corp., 934 F.2d 450, 454-55 (2d Cir. 1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

**ADA and §504 Claims**

The plaintiff alleges that the defendants, individually[6] and in their official capacities, failed to provide him with all reasonable accommodations while he was confined in Wende and Sullivan SHU, and that he was excluded from participation in or enjoyment of various prison programs or services based solely on his visual impairment, in violation of the ADA and § 504.

---

[6]   As an initial matter, there is no individual liability under Title II or § 504 because liability under those statutes only applies against a "public entity," not individuals. See Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001). To this extent, the plaintiff is barred from bringing suit against the defendants in their individual capacities. See Andino v. Fischer, 698 F. Supp. 2d 362, 380 (S.D.N.Y. 2010); Herzog v. McLane Northeast, 999 F. Supp 274, 276 (N.D.N.Y. 1998). Thus, the Court reviews the sufficiency of these claims as against the defendants in their official capacity only. Harris v. Mills, 572 F.3d 66 (2d. Cir. 2009).

(Docket No. 55 at 14-15).

Title II of the ADA "proscribes discrimination against the disabled in access to public services." Harris v. Mills, 572 F.3d 66, 73 (2d Cir. 2009)(citation omitted).  It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. (citing 42 U.S.C. § 12132).  "To assure those requirements are met, 'reasonable accommodation' may have to be provided to the qualified individual." Harris, 572 F.3d at 73 (citation omitted).  Similarly, § 504 of the Rehabilitation Act "requires that specified 'otherwise qualified' disabled individuals receive reasonable accommodations from programs receiving federal financial assistance." Id. (citing 29 U.S.C. § 794(a)).  "[T]he same factual allegations generally will support both ADA and Rehabilitation Act claims," and thus, these claims may be considered together. Fulton v. Goord, 591 F.3d 37, 42 n.1 (2d Cir. 2009); Shomo v. City of New York, 579 F.3d 176, 185 (2d Cir. 2009).

To state a prima facie claim under either the ADA or the Rehabilitation Act, a plaintiff must allege: "(1) that he is a 'qualified individual' with a disability;  (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." Fulton, 591 F.3d at 43 (citation omitted).[7]  "A qualified individual can base a

---

[7]     A "qualified individual" is defined as:

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the

discrimination claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." <u>Fulton</u>, 591 F.3d at 43 (citations omitted).

Here, the defendants do not dispute that the plaintiff's visual impairment constitutes a physical impairment and handicap under Title II and § 504, and that the plaintiff is a qualified disabled individual able to participate in the programs and services offered to inmates in SHU.[8] (Docket No. 102 at 7). Thus, the only issue before this Court is whether the plaintiff was denied the opportunity to participate in or benefit from the defendants' services, programs, or activities, or was otherwise discriminated against by the defendants, by reason of his disability while he was housed in SHU.

It is undisputed that SHU is a segregated housing unit for disciplinary and detention functions. (Docket No. 113 at ¶ 19). The defendants state that the purpose of segregating SHU inmates from the general population is to assume immediate control and supervision of inmates who do not comply with the state and facility rules or who are a threat to themselves, to others, or to the facility. (Docket No. 101 at ¶ 5; Docket No. 116 at ¶ 8). The defendants assert that SHU policies are geared toward creating conditions in which the inmates and staff can live in a safe

---

essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

<u>Fulton</u>, 591 F.3d at 43 (quoting 42 U.S.C. § 12131(2)).

[8]    The defendants also do not dispute that DOCS receives federal financial assistance for purposes of § 504. To establish a violation under § 504, a plaintiff must present sufficient evidence of the elements outlined above, and, in addition, the defendants must receive federal funding. <u>See</u> <u>Colwell v. Suffolk Cty. Police Dep't</u>, 158 F.3d 635, 641 (2d Cir. 1998); 29 U.S.C. § 794(a).

and orderly environment. The defendants acknowledge that in doing so, all SHU inmates are

deprived of the same access, privileges and accommodations available to inmates in the general

population.  (Docket No. 116 at ¶ 9).  The defendants assert that, with respect to impaired

inmates in SHU, special accommodations are granted, but that due to security concerns the

accommodations may be different from those afforded to the impaired inmates in the general

population. (Docket No. 116 at ¶¶ 9-12).

The Court is mindful of difficulties inherent in the administration of a correctional

facility.  As the Supreme Court stated in Turner v. Safley, 482 U.S. 78 (1987), although "prison

walls do not form a barrier separating prison inmates from the protections of the Constitution," ...

"courts are ill equipped to deal with the increasingly urgent problems of prison administration

and reform."  Turner, 482 U.S. at 84 citing Procunier v. Martinez, 416 U.S. 396, 413-414 (1974).

In reviewing a regulation or policy of a correctional facility, the Court must give deference to the

prison authorities.  As stated in Turner:

> "the problems of prisons in America are complex and intractable,
> and, more to the point, they are not readily susceptible of resolution
> by decree." ... Running a prison is an inordinately difficult
> undertaking that requires expertise, planning, and the commitment
> of resources, all of which are peculiarly within the province of the
> legislative and executive branches of government. Prison
> administration is, moreover, a task that has been committed to the
> responsibility of those branches, and separation of powers concerns
> counsel a policy of judicial restraint. Where a state penal system is
> involved, federal courts have, as we indicated in Martinez,
> additional reason to accord deference to the appropriate prison
> authorities.

Turner, 482 U.S. at 84-85, quoting Procunier, 416 U.S. at 405. Thus, the Supreme Court

reaffirmed that if a prison regulation impinges upon an inmate's constitutional rights, the

regulation is valid if it is reasonably related to a legitimate penological interest.  The Court held

that if their prior cases had not yet resolved the issue:

> we resolve it now: when a prison regulation impinges on inmates'
> constitutional rights, the regulation is valid if it is reasonably
> related to legitimate penological interests. In our view, such a
> standard is necessary if "prison administrators ..., and not the
> courts, [are] to make the difficult judgments concerning
> institutional operations." ... Subjecting the day-to-day judgments of
> prison officials to an inflexible strict scrutiny analysis would
> seriously hamper their ability to anticipate security problems and to
> adopt innovative solutions to the intractable problems of prison
> administration. The rule would also distort the decision making
> process, for every administrative judgment would be subject to the
> possibility that some court somewhere would conclude that it had a
> less restrictive way of solving the problem at hand. Courts
> inevitably would become the primary arbiters of what constitutes
> the best solution to every administrative problem, thereby
> "unnecessarily perpetuat[ing] the involvement of the federal courts
> in affairs of prison administration."

Turner, 482 at 89 (citations omitted).

Also, in reviewing the reasonableness of the accommodations provided to Lopez while in

SHU, the Court does not look to whether they are equal to the accommodations provided to him

while he was housed in the general population, but whether they are sufficient to allow him to

adequately participate in, and obtain the benefit from, the programs and activities provided to the

non-impaired inmates in SHU.

The salient facts in this case are largely undisputed.  Although Lopez was not provided

the typewriter or desk he desired, he was issued 20/20 pens, large print paper and envelopes, and

an electric magnifier.  (Docket No. 108  at ¶¶  28, 42.)  Moreover, because the 20/20 pens do not

produce carbon copies, the plaintiff was further accommodated by being provided with four free

copies of his written work, even though non-impaired inmates in SHU are not entitled to copies.

(Docket No. 108 at ¶ 30).[9]  The record also demonstrates that the plaintiff had equal access to books and law materials in SHU.  To the extent Lopez requested available large print materials, they were provided to him. (Docket No. 108 at ¶ 18).  Although the plaintiff was not provided with the reading scanner he used in general population, the plaintiff was provided with the use of an electric magnifier. (Docket No. 103 at ¶ 22).  While the plaintiff was denied a talking dictionary, a large print dictionary was available to him. (Docket No. 108 at ¶ 18).  Additionally, the record reflects that, upon request, the plaintiff was able to obtain assistance from the IOB who assists visually impaired inmates in filling out forms and other writing needs (Docket No. 113 at ¶ 28) and had access to the Law Library Officer, who makes rounds daily, for additional assistance with filling out forms and mail.  (Docket No. 108 at ¶ 26; Docket No. 103 at ¶ 24).  The plaintiff's request for an IMA while in SHU was denied.  According to the defendants, in light of the increased danger inherent in an SHU, IMAs are not available to SHU inmates for the protection the IMAs. (Docket No. 108 ¶¶ 9, 20).  Instead, the record reflects that SHU staff have been trained by the Elizabeth Olmstead Center for Sight and are able to appropriately provide the plaintiff with special assistance when moving around the facility. (Docket No. 113 at ¶ 31; Docket No. 103 at ¶ 16).  The record reflects that SHU staff were available to provide escort when necessary. (Docket No. 113, Exhibit I at Bates No. 112).[10]

---

[9]  SHU policies are consistent for each inmate in a facility SHU, but may differ from facility to facility.  (Docket No. 113 at ¶ 40). Thus, while housed in the SHU at Sullivan, the plaintiff was issued an electronic magnifier, a tape player and headphones, large print materials, a lamp, sunglasses for indoor use, an officer trained as a sited guide, and a talking dictionary. (Docket No. 113 at  ¶ 42).  The Sullivan law library and general library policies for SHU inmates also allows the inmates to order a greater number of books than the Wende SHU policy.

[10]  The record reflects that IMAs assist visually impaired inmates in general population with movement throughout the correctional facility, however, visually impaired inmates in

The plaintiff also claims that he was discriminated against because he was not provided with a desk, extended showers, an electric trimmers and his electric chess set.  As noted above, inmates in SHU are not provided with desks.  Although it may have not been as convenient as the plaintiff would have liked, the record in this case reflects that the plaintiff was able to read and write sufficiently to participate in and benefit from the programs and activities available to non-impaired SHU inmates. Further, there is no provision to provide vison impaired inmates with extended shower time in SHU. All SHU inmates are provided with ten minutes to shower and shave. (Docket No. 113 at ¶ 32).  The plaintiff was provided his electric razor for shaving.  The plaintiff was denied electric trimmers because he already had an electric razor. (Docket No. 113 at ¶ 33).  Lopez has not demonstrated that he had a medical need for the electric trimmers or that non-impaired inmates in SHU are allowed to have electric trimmers in addition to their electric razors.  The plaintiff has not raised an issue of fact as to whether he was able to sufficiently deal with his personal hygiene needs.  Lopez has not demonstrated that non-impaired inmates in SHU are allowed to possess chess sets, electric or otherwise.

The plaintiff does not dispute that he was provided with the various accommodations discussed above, but insists that he be provided a typewriter and other assistive devices he used while housed in the general population.  The plaintiff's reliance upon Clarkson v. Coughlin, 898 F.Supp. 1019 (S.D.N.Y. 1995) is misplaced.  In Clarkson, the plaintiffs were deaf and hearing impaired inmates who challenged the lack of accommodations for hearing impaired inmates. At

---

general population do not have access to IMAs while they are in the recreation yard. The IMAs escort the inmate to the recreation yard, acquaint them with the surroundings but leave the visually impaired inmate in the yard.  Upon the completion of recreational time, the IMA escorts the impaired inmate from the yard. (Docket No. 103 at ¶30).  While a visually impaired inmate is in SHU, SHU staff perform these functions. (Docket No. 113, Exhibit I at Bates No. 112).

that time, DOCS had only one sensorially disabled unit ("SDU") which was located at the

Eastern Correctional Facility ("Eastern"), and which was available only to a limited number of

male inmates[11], and not available at all to female inmates.  In <u>Clarkson</u>, the Court held that

hearing impaired inmates not in the SDU at Eastern were not provided with interpretive services

and assistive devices and were unable to fully participate in various proceedings to protect their

rights (i.e. grievances, disciplinary and good-time proceedings, change of status hearings).

<u>Clarkson</u>, 898 F.Supp. at 1038.   The Court found that the defendants' failure to provide the

impaired inmates with assistive devices so that they could fully participate in, and benefit from,

the programs available to non-impaired inmates violated the plaintiffs' rights.  With respect to

the SDU at Eastern, the Court noted that inmates were sometimes transferred out of the SDU.

The Court held that this violated the ADA because it effectively made the accommodations

conditional. In <u>Clarkson</u>, the inmates that were transferred out of the SDU were not provided

with alternative accommodations which would allow the impaired inmates to fully participate in

all programs available to non-impaired inmates. <u>Clarkson</u>, 898 F.Supp. at 1050-1051. Unlike

<u>Clarkson</u>, in the instant case, the plaintiff has been provided with alternative accommodations

which enable him to fully participate in the programs available to non-impaired inmates in SHU.

<u>Clarkson</u> does not hold that prison officials cannot consider the special dangers and challenges

inherent in the SHU environment and provide impaired inmates sentenced to SHU with adequate

alternatives to the accommodations they received while in the general population.

       Notwithstanding the plaintiff's conclusory claims, the numerous grievances and letters

written by the plaintiff during his time in SHU, which are attached as Exhibit I to Docket No.

---

       [11]   The SDU housed only 30 inmates. <u>Clarkson</u>, 898 F.Supp. at 1027.

113[12], demonstrate that the accommodations provided to him allowed him to effectively read and write sufficiently to participate in, and benefit from the programs and activities provided to non-impaired SHU inmates.  While the plaintiff must be accommodated so that he can participate in and benefit from the programs available to a non-impaired SHU inmate, he does not have the right to choose how he is to be accommodated in that regard.  Particularly in the context of an inmate residing in SHU, the fact that the plaintiff would prefer certain conveniences, as opposed to the accommodations provided to him, does not constitute a violation of the ADA or §504.  Here, the accommodations provided to the plaintiff while he was in SHU at both Wende and Sullivan were adequate so that he could fully participate in the programs available to non-impaired SHU inmates.  Thus, the defendants are entitled to summary judgment with respect to the ADA and §504 claims.

**New York Human Rights Law Claim**

The plaintiff also asserts a state law claim under the New York Human Rights Law against the defendants in their individual and official capacities. (Docket No. 55 at 15-16).

To the extent these claims are asserted against the defendants in their official capacity, they are barred by the Eleventh Amendment.  Melrose v. New York State Dept. of Health Office of Professional Medical Conduct, 2009 WL 211029 (S.D.N.Y. 2009)(New York Executive Law

---

[12]   Exhibit I consists of approximately 476 pages relating to grievances written by Lopez while he was in SHU.  Most of these 476 pages are the plaintiff's handwritten grievances complaining of a variety of conditions including the denial of his preferred accommodations (Bates Nos. 132 to 163).  Contrary to the plaintiff's unsubstantiated assertion, the volume of material produced by the plaintiff reflects that he was not limited in his ability to participate in disciplinary, grievance or legal proceedings compared to a non-impaired inmate in SHU.

§ 296 includes no waiver of New York's Eleventh Amendment immunity to suit in federal court).

See also Winokur v. Office of Court Admin., 190 F.Supp.2d 444, 451 (E.D.N.Y. 2002); Lambert

v. N.Y. State Office of Mental Health, 2000 WL 574193, at *7 (E.D.N.Y. Apr.24, 2000), aff'd,

22 F. App'x 71 (2d Cir.2001); Arroyo v. N.Y. State Ins. Dep't, 1993 WL 248210, at *3 (S.D.N.Y.

June 30, 1993).

To the extent that such claims under §296 may be cognizable against the defendants in

their individual capacity, such claims are governed by the same legal standards as claims under

the ADA and §504 of the Rehabilitation Act of 1973. See Parker v. Columbia Pictures Indus.,

204 F.3d 326, 332 n. 1 (2d Cir.2000). Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d

113 (2d. Cir. 2004); Treglia v. Town of Manlius, 313 F.3d 713 (2d. Cir. 2002). Thus, the

defendants are entitled to summary judgment with respect to the plaintiff's §296 claims based

upon the same reasoning set forth above as to the ADA and §504 claims.


**Eighth Amendment Claim**

The plaintiff brings an Eighth Amendment claim, asserting that the defendants have

subjected him to inhumane and inadequate conditions of confinement by acting with deliberate

indifference to his serious medical needs. (Docket No. 55  at 9-13).

The Eighth Amendment outlaws "cruel and unusual punishments." U.S. Const. amend.

VIII. "This includes punishments that 'involve the unnecessary and wanton infliction of pain.' "

Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998) (quoting Gregg v. Georgia, 428 U.S. 153,

173 (1976)). See also Hernandez v. Keane, 341 F.3d 137, 144 (2d. Cir. 2003).  While "society

does not expect that prisoners will have unqualified access to health care," Hudson v. McMillian,

503 U.S. 1, 9 (1992), an inmate can nevertheless prevail on an Eighth Amendment claim arising out of medical care by showing that a prison official acted with "deliberate indifference" to the inmate's serious medical needs. Hathaway v. Coughlin, ("Hathaway I"), 37 F.3d 63, 66 (2d Cir.1994) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

This standard incorporates both objective and subjective elements. The objective "medical need" element measures the severity of the alleged deprivation, while the subjective "deliberate indifference" element ensures that the defendant prison official acted with a sufficiently culpable state of mind. Smith v. Carpenter, 316 F.3d 178, 183 -184 (2d. Cir. 2003). To prevail on a constitutional claim of deliberate medical indifference, a plaintiff must prove that he suffered from an objectively serious medical condition, which the defendants knew of and deliberately disregarded. Green v. Senkowski, 2004 WL 1292786, *1 (2nd Cir. 2004) citing Chance, 143 F.3d at 702 (collecting cases). A serious medical condition is one that may result in death, degeneration, or "chronic and substantial pain." Id.; see Hathaway I, 37 F.3d at 66. This standard contemplates a "condition of urgency, one that may produce death, degeneration, or extreme pain." Nance v. Kelly, 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). A serious medical need arises where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Chance, 143 F.3d at 702. To satisfy the subjective prong of the test, prison officials must have acted with a sufficiently culpable state of mind, i.e., deliberate indifference. Plaintiff must therefore show that prison officials intentionally denied, delayed access to, or intentionally interfered with prescribed treatment. See Estelle, 429 U.S. at 104-05. See also Farmer v. Brennan, 511 U.S. 825, 837 (1994)("[A] prison official cannot be found liable under the Eighth Amendment for denying an

18

inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." ' Hathaway II, 99 F.3d at 553 (quoting Farmer, 511 U.S. at 835). Accordingly, subjective recklessness can satisfy the deliberate indifference standard where "the official has actual knowledge that the prisoner faced a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847. However, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106.

Also, it is well-established that a prisoner is not entitled to receive the medical treatment of his choice.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment or a different doctor does not give rise to an Eighth Amendment violation. Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir.1986) (The essential test is one of medical necessity and not one simply of desirability).  A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983  claim. Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998); Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir.1986);  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir.1981).  The Constitution does not require that an inmate receive a particular course of treatment, or that an inmate see a requested specialist. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997), Davis v. Hall, 992 F.2d 151, 153 (8th Cir.1993).

Similarly, a showing of nothing more than a difference of medical opinion as to the need

to pursue one course of treatment over another is insufficient, as a matter of law, to establish

deliberate indifference. Chance v.Armstrong, 143 F.3d. 698 (2d. Cir. 1998); Johnson v. Snow,

2008 WL 2224949 (N.D.N.Y., 2008); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989); Sires

v. Berman, 834 F.2d 9, 13 (1st Cir.1987) ("Where the dispute concerns not the absence of help,

but the choice of a certain course of treatment, or evidences mere disagreement with considered

medical judgment, [a court] will not second guess the doctors." (citations omitted)).

Finally, it is well settled that a plaintiff asserting an Eighth Amendment claim based upon

inadequate medical care must establish deliberate indifference for each individual defendant

against whom the claim is asserted. Brock v. Wright, 315 F.3d 158, 164 (2d Cir.2003)(stating

that plaintiff must show deliberate indifference on the part of a "particular defendant").

Here, the plaintiff claims that if he is forced to read without the assistive devices he

desires, he gets headaches and watery eyes. (Docket No. 132 at ¶ 4).  While he characterizes the

pain as "extreme" (id.), he does not allege that it is more than temporary.  The plaintiff does not

assert that he has requested, and was denied, medical treatment for the headaches.  Instead, he

argues that the headaches may be addressed only by returning his preferred assistive devices to

him.  In support of this argument, Lopez points to the affidavit of Cynthia Flowers ("Flowers")

dated January 14, 2008.  Flowers is a former IOB at Wende. (Docket No. 128 at ¶ 2).[13]  She

asserts that she had advocated for Lopez while he was in SHU in an attempt to have Lopez'

---

[13]   Flowers worked for DOCS for only five months.  According to Flowers resignation
letter, dated April 11, 2007, Flowers resigned from DOCS, asserting that she did not agree with
the "attitudes and actions" of several correctional officers and staff at Wende who branded her as
being "too sympathetic" to the inmates. (Docket No. 128, Exhibit F)

preferred assistive devices returned to him, but that defendant Raymond denied her requests.

(Docket No. 128 at ¶ 9).  The plaintiff also relies upon the medical reports from Dr. Shahroka C.

Khani which recommend that the plaintiff needs his vison aids to be returned. (Docket No. 128,

Exhibit A pages 1-3).[14]  These medical reports state that there was poor prognosis that Lopez

would recover any vision lost to Best's Disease, but noted that he was "unlikely to lose more."

(Docket No. 128, Exhibit A at page 1).  Although the medical reports recommend that the

plaintiff be returned his vision aids, only one of the three reports notes that the plaintiff

complained of headaches. The medical reports do not prescribe any medical treatment for the

headaches. Dr. Jacqueline Levitt, one of the defendants in this case, testifies that she was Lopez'

treating physician at the time of the underlying events in this case. (Docket No. 109 at ¶ 1). Dr.

Levitt states that on July 11, 2007 she reviewed the plaintiff's medical records, including the

reports from Dr. Khani, which recommended that the plaintiff be returned his assistive devices.

(Docket No. 109 at ¶ 9). Dr. Levitt stated that Dr. Khani's request was only a recommendation

and that the determination of what accommodations are to be employed is made by the facility

medical department with the help of the Deputy Superintendents and Superintendent. (Docket

No. 109 at ¶ 10). Dr. Levitt stated that she typically defers to the facility administrators on

questions of what is allowed for security purposes, but would object if she believed that it was

absolutely necessary that a sensorially impaired inmate be allowed an accommodation.  Dr.

---

[14]   Although the plaintiff's own declaration asserts that reading without the assistive
devices gives him watery eyes (Docket No. 132 at ¶¶ 4); the affidavit of Flowers and the medical
records upon which the plaintiff relies assert that Lopez complained that reading without the
devices results in eye dryness. (Docket No. 128 at ¶ 9; medical report dated March 1, 2007,
Exhibit A at page 1; medial report dated March 19, 2007, Exhibit A at page 2; medical report
dated June 8, 2007, Exhibit A at page 3).

Levitt did not believe such was the case with respect to the plaintiff's request for his preferred accommodations. (Docket No. 109 at ¶ 8).

Based upon the record before the court, the plaintiff has failed to make a threshold showing that the medical condition at issue presented a serious medical need, <u>Bradley v. Rell</u>, 703 F.Supp.2d 109 (N.D.N.Y. 2010)(collecting cases)(even accepting as true Plaintiff's factual assertions that he suffers from "extreme headaches" and "psychological problems", he has failed to introduce any admissible evidence from which a rational factfinder could conclude that his injuries were sufficiently serious to constitute a serious medical condition.). Further, the plaintiff also fails to demonstrate deliberate indifference on the part of one or more of the defendants. <u>Leach v. Dufrain</u>, 103 F.Supp.2d 542, 546 (N.D.N.Y. 2000). The gravamen of this claim is not that the defendants denied the plaintiff medical care while he was in SHU, but rather that they failed to heed an outside opthalmologists's recommendations that the plaintiff's assistive devices be returned to him in SHU. At best, the plaintiff has produced evidence that Dr. Leavitt and Dr. Khani disagreed as to the plaintiff's need for the assistive devices from a medical perspective. Although the assistive devices may have made it easier for the plaintiff to read, a reasonable factfinder could not conclude that the defendants were deliberately indifferent to a serious medical need on the part of the plaintiff. Accordingly, the defendants are entitled to summary judgment with respect to the plaintiff's Eighth Amendment claims.

**Procedural Due Process Claim**

The plaintiff also asserts a due process claim. The only due process claim asserted in the Second Amended Complaint is that Lopez' procedural due process rights were violated by the

22

defendants' alleged denial of reasonable accommodations to him.  (Docket No. 55 at ¶¶ 63-69, 86-89).   Again, the gravamen of the plaintiff's due process claim was that he could not adequately participate in the disciplinary proceedings against him because he was not provided with the assistive devices he prefers. As discussed more fully above, the plaintiff was afforded reasonable accommodations while in SHU in order to meaningfully participate in disciplinary, grievance, and court proceedings.  He was provided with accommodations to assist his ability to read and write, and was given access to law library materials. He also was able to obtain assistance from the IOB and the Law Library Officer. The unchallenged documentary evidence demonstrates that Lopez produced hundreds of pages of grievances and letters while he was in SHU.  (Docket No. 113, Exhibit I).  The plaintiff has failed to identify any specific witness he was prevented from calling at the disciplinary hearings. Similarly, the plaintiff has not identified any specific evidence or legal materials to which he was denied access during the administrative hearings.

Based on the above, the plaintiff has failed to raise a question of fact relating to the asserted procedural due process claim.

### Conclusion

Based on the above, the defendants' motion for summary judgment is granted and the second amended complaint is dismissed in its entirety.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied.  Coppedge v. United States, 369 U.S. 438, 82 S. Ct. 917, 8 L. Ed.2d 21 (1962).

Further requests to proceed on appeal as a poor person should be directed, on motion, to the

United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal

Rules of Appellate Procedure.

So Ordered.

/s/ Hugh B. Scott
United States Magistrate Judge
Western District of New York

Buffalo, New York
March 29, 2011

24